[Cite as *State v. Meade*, 2016-Ohio-493.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   102896

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## BRANDON MEADE

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-586323-A

**BEFORE:**   Boyle, J., Jones, A.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**   February 11, 2016

**ATTORNEY FOR APPELLANT**

Allison S. Breneman
1220 West 6th Street
Suite 303
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Ryan J. Bokoch
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Brandon Meade, appeals his conviction of robbery, challenging the weight and sufficiency of the evidence to support the conviction. Finding no merit to the appeal, we affirm.

## A. Procedural History and Facts

{¶2} Meade was indicted on a single count of aggravated robbery, which carried a one- and three-year firearm specification. Meade pleaded not guilty to the charges, and the matter proceeded to a bench trial where the following evidence was presented.

### 1. Victim Identifies Meade's License Plate Following Robbery

{¶3} Erick Jauregui testified that, on April 14, 2014, in the early morning, he was heading home from a friend's house and walking along Lorain Avenue when a vehicle pulled over and two males got out. According to Jauregui, prior to the car pulling over, the occupants were yelling, which he "paid no attention" until they started "talking back" to him. Jauregui further explained, "They were just * * * mad and sounded pretty intoxicated." Three men ultimately exited the vehicle and confronted Jauregui, with one of the men hitting him. Jauregui testified that, after stating he only had his phone and "nothing" in his wallet, one of the men told another to go to the car and "get something," which turned out to be a gun. Jauregui testified that he "got punched in the face a couple times," requiring him to get stitches. The perpetrators took Jauregui's iPhone 5.

{¶4} Jauregui further testified that, prior to the car driving off, he obtained the license plate on the vehicle. Jauregui ran into police officers on Lorain Avenue minutes

after the incident and immediately reported what happened and provided the perpetrators' license-plate number.

## 2. *Video Surveillance of Encounter*

{¶5} The state offered a surveillance video obtained from a nearby bank at the time of the incident and asked Jauregui to detail step by step the actions of the perpetrators as seen on the video. Because of the distance of the camera, faces cannot be seen on the camera — only body images. Jauregui identified himself in the video walking alone at 2:08 a.m., heading westbound on Lorain Avenue and crossing the intersection of West 98th Street. Immediately after Jauregui crossed the street, a vehicle turned left from Lorain Avenue and stopped on the corner of West 98th Street, facing southbound. One male exited the car and approached Jauregui, and two males are seen running across the intersection and meeting up with Jauregui and the other male. The two individuals running across the street apparently exited the vehicle prior to the driver turning southbound on West 98th Street. An individual from the group ultimately returned to the vehicle and then the vehicle pulled up a bit and turned around on West 98th Street, heading westbound on Lorain Avenue and stopped right across from the group, waiting for the other men. Once the men entered the vehicle, the vehicle left the area.

{¶6} Jauregui testified that Meade, who he had never seen prior to the robbery, later contacted him on Facebook and told him that he was "sorry about the whole

situation" and claimed that "it wasn't his fault." According to Jauregui, Meade admitted to being the driver but denied knowing the "true intentions" of the others.

> 3. *Police Respond to Meade's Residence and Tow the Vehicle Involved in Robbery*

{¶7} The state offered the testimony of the officers who encountered Meade on the street minutes following the robbery. Cleveland police officer Matthew Prince testified that he and Officer Brian Kazimer were patrolling the area of West 101st Street and Lorain Avenue when they were approached by Jauregui, who had a bloody nose and lip. According to Officer Prince, Jauregui was upset, reporting that he had just been robbed. Jauregui provided the officers the license plate and make of the vehicle involved. Officer Prince then placed a radio broadcast for the suspected vehicle and drove to the nearby address where the vehicle was registered. The vehicle was registered to Meade. The officers did not see the vehicle at the home at that time.

{¶8} Officers Prince and Kazimer returned to the address a couple of hours later after another patrol car had observed the suspected vehicle parked in the driveway. Officer Prince further testified that, although no one answered the door when he knocked, he believed that someone was home based on the movements that he heard and the shadows that he observed. Cleveland police officer Louis Collier, who assisted in locating the suspected vehicle and remained on the scene, testified that he believed someone was home when Officer Prince knocked on the door, despite no one answering, because he "saw a light come on in the upstairs bedroom" and "movement at the

curtains." Officer Kazimer testified, however, that "it did not appear that anyone was home."

{¶9} The vehicle was ultimately towed from the driveway and processed for criminal tools. Following the victim's identification of Meade in a photo array, Meade was arrested and charged.

    4.   *Meade Testifies and Denies Any Knowledge of Passengers' Intentions*

{¶10} Meade testified on his own behalf. According to Meade, he had no idea that the passengers in his car in the early morning of April 14, 2014, were planning on robbing the person that they saw walking alone on Lorain Avenue. Specifically, Meade testified that on the evening of April 13 and early morning of April 14, 2014, he was hanging out with his friend David Dial, who he has known for almost nine years, and two other male friends of David's that he did not know by name. Meade described the one male as "black, pretty tall, and slender" and the other male as "Puerto Rican with medium build, medium height." Meade testified that these two individuals were already at David's house when he went to go pick up David to "hang out." The four of them left David's house around 12:30 a.m. and "headed over" to West 130th Street to hang out with another one of David's friends and then left upon getting tired.

{¶11} According to Meade, he was driving down Lorain Avenue, passing West 98th Street, when "they saw someone on the road" and "the taller black guy yelled out the window, 'Hey, what's up?'" After the person on the street responded, the taller black guy asked Meade to pull over "really quick" so that he could go talk to him. Upon

pulling over, "David and the black guy get out of the car," and the male in the front seat directed Meade "to pull around to 98th," which he did. Meade testified that he pulled up to West 98th Street but did not park the car — "I just put on my brakes and just sat there." Next, the front seat passenger exited the car. According to Meade, he did not know what was going on; he simply waited in the car, playing some games on his phone. Then, the front seat passenger returned to the car, indicating that the others were ready to be picked up. Meade pulled the car forward and then turned around, heading toward Lorain Avenue.

{¶12} Meade testified that, after turning on Lorain Avenue, he witnessed "some fighting." Upon Meade yelling for them to stop, David returned to the car first and then the other male. Meade further testified that he thought "maybe they had exchanged some words and it got rough." Meade testified that later that night he became aware of what actually happened based on David's admission. Meade testified that he never saw a firearm and that he would never let anyone in his car who possessed a firearm.

{¶13} Meade also testified that he expected David to be in court and that he tried contacting him but was unsuccessful. Meade further admitted that he contacted the victim through Facebook, despite his attorney instructing him not to contact anyone involved in the case. According to Meade, he wanted to apologize to the victim because he "felt bad about the whole situation."

    5.   *On Cross-Examination, Meade Admits That He and Others Surrounded the Victim*

{¶14} On cross-examination, Meade denied knowing the names of David's friends that were with him in the car that evening. He further stated that, despite not knowing these men, he was just "doing as I was told." Meade confirmed that he dropped two men off behind the victim and one in front of the victim and that he stopped the car south on West 98th Street, which effectively surrounded the victim and blocked at least three directions of his travel. Meade further acknowledged that he ultimately drove all three away from the scene.

{¶15} Upon being shown the surveillance video, Meade also acknowledged that he mistakenly testified that he was headed eastbound. Meade admitted that, prior to letting the first two individuals out, Meade pulled into a bank parking lot and turned his car around so that he was facing the direction that the victim was walking. Meade further acknowledged that the occupants in the car waited in the parking lot for 40 seconds prior to anyone exiting the vehicle. According to Meade, they all sat in silence during this time.

{¶16} Meade also admitted that he violated a court order by contacting the victim through Facebook but denied that he was trying to influence the victim's testimony.

6. *Meade Explains Why He Didn't Drive Away or Call 911*

{¶17} Upon questioning from the trial court as to why Meade did not drive away when he witnessed the fighting, Meade stated that he did not know who started the fight. He further explained that he did not call 911 when he saw the fight because he "sees fights all the time" and "didn't think anything of it." Meade also testified that he did not

answer the door when the police arrived at his house because he was in bed. According to Meade, he slept through the police officers' pounding on the door.

### 7. The Verdict

**{¶18}** The trial court ultimately found Meade not guilty on the aggravated robbery charge but guilty of the lesser included offense of robbery. The court also found that the state failed to meet its burden on the firearm specifications and acquitted Meade on those charges. In reaching its verdict, the trial court stated the following:

> Clearly, it was your car. Clearly, you knew who was in the car. I didn't find your testimony to be very credible.
>
> You clearly confronted this witness, in violation of a court order, which I think was self-serving in an attempt to manipulate both him and potentially the eventual fact finder of the case.
>
> I don't believe that you drove strangers around in your car; that the only one you knew was David Dial. I don't believe that you didn't know they were gonna' commit a robbery. I don't believe that you weren't involved in it. I actually believe that you were involved in it.
>
> Between the testimony of yourself, the testimony of the victim, the video evidence, the Court finds that the state has met its burden.

### 8. The Sentence

**{¶19}** After referring Meade for a presentence investigation report, the trial court ultimately imposed a sentence of one year of community control sanctions.

**{¶20}** Meade now appeals, raising two assignments of error.

## B. Manifest Weight of the Evidence

**{¶21}** In his first assignment of error, Meade argues that his conviction is against the manifest weight of the evidence. We disagree.

**{¶22}** When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Id.* Although the appellate court may act as a thirteenth juror, it should give due deference to the findings made by the factfinder. *Id.* at 388. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id.*

**{¶23}** Meade was convicted of robbery in violation of R.C. 2911.01(A)(1), which provides in relevant part: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another."

**{¶24}** The conviction was premised on Meade aiding and abetting in the commission of the robbery. "[A] defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission * * *." *State v. Herring*, 94 Ohio St.3d 246, 251, 2002-Ohio-796, 762 N.E.2d 940. Ohio's complicity statute, R.C. 2923.03(A)(2), provides, in pertinent part: "No person, acting with the kind

of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense."

{¶25} "To support a conviction for complicity by aiding and abetting * * * the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971); *see also State v. Harmon*, 8th Dist. Cuyahoga No. 53221, 1988 Ohio App. LEXIS 629 (Feb. 18, 1988). Driving a getaway car or serving as a lookout are overt acts of aiding and abetting. *Cartellone* at *id.*

{¶26} "The mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). This rule protects innocent bystanders who have no connection to the crime other than simply being present at the time of its commission. *Johnson* at 245.

{¶27} Meade contends that the trial court should have believed his testimony that he did not "have any knowledge of what was transpiring." He argues that the police

failed to properly investigate the case by not interviewing David Dial and that the state failed to present any evidence that contradicted his version of the events, which were also corroborated by the Facebook message that he sent the victim. We find Meade's arguments to lack merit.

{¶28} It is well settled that, although we consider credibility in a manifest weight review, issues relating to the credibility of witnesses and the weight to be given are primarily for the trier of fact. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "The trier of fact is free to believe all, part, or none of the testimony of each witness who appears before it." *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 34, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist.1992). And based on the evidence presented by the state, we cannot say that the trial court lost its way in rejecting Meade's claim that he had no knowledge of the robbery and did not assist.

{¶29} We find the evidence strongly supports the state's theory that Meade was the "getaway" driver. The record establishes — based on Meade's own testimony — that Meade pulled the vehicle over in a parking lot and sat there for 40 seconds while he and the other passengers all observed the victim — an individual who was walking alone in the early morning hours. Next, Meade dropped two passengers off behind the victim and one passenger in front of the victim, and then stopped his car on the corner of Lorain Avenue and West 98th Street, thereby surrounding the victim. Notably, Meade testified

that, after letting all the passengers out of his car, he never put the car in park; he kept his foot on the brake the entire time. Meade also testified that they were coming from the area of West 130th when they first encountered the victim, but after the victim was robbed, the vehicle was observed traveling in the opposite direction. The strategic drop-off of the occupants, coupled with Meade never parking the car and then driving off in the opposite direction of where he was initially traveling prior to encountering the victim, belie Meade's claim that he had no knowledge that the occupants intended to rob the victim.

{¶30} Moreover, Meade's testimony that he did not know the occupants in his vehicle, aside from David Dial, also undermined his credibility given that he was hanging out with these men and following their "orders" that evening. Furthermore, we find the Facebook message sent by Meade to the victim was simply an attempt by Meade to bolster his own self-serving testimony; we do not agree that it is reliable evidence indicative of Meade's innocence.

{¶31} Accordingly, we find that this is not the exceptional case where the evidence weighs against the conviction. The first assignment of error is overruled.

## C. Sufficiency of the Evidence

{¶32} In his second assignment of error, Meade argues that the state failed to produce sufficient evidence to support the conviction. We disagree.

{¶33} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally

sufficient to support the jury verdict as a matter of law." *Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶34} Meade argues that the video surveillance only proves, at best, that Meade was present when a robbery was committed around the corner. According to Meade, there is no evidence that he had any knowledge of the robbery or assisted in the robbery to support a conviction as an aider or abettor to the robbery. Relying on this court's decision in *State v. Langford*, 8th Dist. Cuyahoga No. 83301, 2004-Ohio-3733, Meade contends that the fact that he drove the car after the perpetrators committed the robbery is not indicative of him driving a "getaway car." Meade maintains that the state utterly failed to prove that he had any knowledge of what was transpiring and therefore he could not have acted as an aider or abettor to the robbery. We find his arguments to lack merit.

{¶35} Contrary to Meade's assertion, we find that the state presented evidence, albeit circumstantial, that Meade not only knew of the robbery but that he actively participated as the driver of the "getaway car." Meade admitted to driving the vehicle carrying all the occupants who confronted and robbed the victim at 2:00 a.m. Further,

the victim's report of the license plate directly linked Meade to the scene. Moreover, the victim's testimony and the video surveillance, evidencing the timing of the events, including the strategic drop off of the occupants, as well as the car never being placed in park and then swinging around to pick up the occupants to leave the scene, supports the state's theory that Meade not only knew of the robbery but actively participated as the "getaway" driver.

{¶36} We find the facts of this case distinguishable from *Langford* and not grounds to vacate Meade's conviction. In *Langford*, the state failed to offer any evidence that Langford assisted in the commission of the two separate robberies at issue. In the first incident, Langford accompanied his friend, Washington, to a convenience store where they purchased cigarettes. Washington drove a few streets away from the convenience store, parked his car, and told Langford that he would be right back. Upon returning to the car, Washington directed Langford to drive. Washington had robbed the Sunoco station at gunpoint. The next day, Washington and Langford were driving together again and stopped at a Marathon station. Langford remained in the car while Washington went inside and robbed the Marathon station. Washington returned to the car, got inside, and "floored it" out of the parking lot.

{¶37} Under these facts, this court held that there was no evidence to implicate Langford in the commission of these robberies beyond mere presence in the vehicle and association with Washington. In finding the evidence insufficient to support Langford's convictions, we reasoned as follows:

* * * the fact that Langford drove the car after Washington committed the Sunoco robbery is not tantamount to driving a "getaway" car. There was no evidence presented which would indicate that Langford sped away to flee the scene or to assist in the commission of the robbery. Additionally, after Washington robbed the Marathon station, he did not allow Langford to drive. Washington did not "require" Langford's service to drive the car in order to successfully commit each robbery.

*Id*. at ¶ 22.

**{¶38}** Unlike Langford, Meade's strategic drop-off of the occupants of his vehicle and the timing of his actions, including waiting for the three occupants and then driving off, directly implicates him in the commission of the robbery. We find that the circumstantial evidence presented allows a reasonable juror to conclude beyond a reasonable doubt that Meade was the "getaway" driver in this case and therefore aided and abetted in the commission of the robbery.

**{¶39}** The second assignment of error is overruled.

**{¶40}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

LARRY A. JONES, SR., A.J., and
PATRICIA ANN BLACKMON, J., CONCUR